IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEANNE COTTER, | ) |
| | ) |
| | ) 2:19-CV-592-NR |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AMERICAN BRIDGE COMPANY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

**J. Nicholas Ranjan, United States District Judge**

Defendant American Bridge Co. moves for summary judgment on all claims in this employment-discrimination case. Applying the familiar standard of Rule 56,[1] because genuine disputes of material fact exist, the Court will deny the motion.

## DISCUSSION & ANALYSIS[2]

Plaintiff Jeanne Cotter alleges that she was terminated from her position as American Bridge's "Director of Quality & Administration" because she is a woman. Based on this allegation, she asserts claims for sex discrimination under Title VII and the PHRA. ECF 29. American Bridge now moves for summary judgment,

---

[1] Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must ask whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In making that decision, the Court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

[2] The Court writes for the benefit of the parties, who are familiar with the factual and procedural background, as well as the record evidence.

arguing that, following discovery, there is no genuine dispute that Ms. Cotter was terminated from her position, not because of her sex, but because of a "reduction in force" ("RIF") imposed as part of a cost-reduction plan.

Ms. Cotter responds by pointing to evidence demonstrating that (1) the decisionmakers responsible for including her position in the RIF harbored biases against female executives; and (2) American Bridge's cost-cutting rationale for the termination was pretextual because Ms. Cotter's job responsibilities were not eliminated, but instead, assigned to a newly promoted male executive. She argues that this is enough to establish a *prima facie* case of sex discrimination and, further, to allow a jury to infer that American Bridge's explanation was pretextual.

The Court agrees with Ms. Cotter. In analyzing her claim, the Court applies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To make out a *prima facie* case of sex discrimination, Ms. Cotter must show that "she is a member of a protected class, that she was qualified for her position[,] and that she was discharged under conditions that give rise to an inference of unlawful discrimination." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (citation omitted). Once she does so, the burden shifts to American Bridge, to proffer a non-discriminatory reason for firing Ms. Cotter. If it does, the burden then returns to Ms. Cotter, who must show once and for all that American Bridge's proffered non-discriminatory explanation is merely a pretext for unlawful discrimination. She may do so by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence … and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (cleaned up). At the pretext stage, "some specificity is required to show that the reason given by the employer was weak, inconsistent or incoherent—enough to

infer that animus could have motivated the decision." *Darby v. Temple Univ.*, 786 F. App'x 368, 370 (3d Cir. 2019).

In applying this framework, as American Bridge correctly notes, "a plaintiff whose employment position is eliminated in a corporate reorganization or work force reduction carries a heavier burden in supporting charges of discrimination than does an employee discharged for other reasons." *Hook v. Ernst & Young*, 28 F.3d 366, 375 (3d Cir. 1994) (citation omitted). That said, "[a] RIF is not an open sesame to discrimination[.]" *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir. 1997) (citation omitted). "[E]ven in a genuine RIF (one that is motivated on a programmatic level by economic concerns), individuals may not be selected for layoff on the basis of [a protected characteristic][.]" *Tomasso v. Boeing Co.*, 445 F.3d 702, 707 (3d Cir. 2006).

Here, American Bridge's argument that Ms. Cotter fails to establish a *prima facie* case is intertwined (and essentially coextensive) with its explanation for her firing,[3] so it is most natural to combine the analysis, and examine the evidence as it bears on both Ms. Cotter's *prima facie* case and the existence of any pretext. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000) ("[E]vidence supporting the *prima facie* case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other."); *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir. 1990) ("[T]he *McDonnell Douglas prima facie* test should not be viewed as a rigid formula." (citation omitted)); *cf. Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990) ("Kraft's claim that Weldon cannot establish a *prima facie* case is intertwined with its assertion that Weldon's poor performance evaluations constitute a legitimate reason for the

---

[3] That is, American Bridge argues that Ms. Cotter was not discharged "under conditions that give rise to an inference of unlawful discrimination" because she was terminated as part of a neutral RIF that included more male employees than female employees—which is also the asserted nondiscriminatory reason for her firing.

discharge."); *Carroll v. Tompkins Rubber Co.*, No. 92-6457, 1993 WL 195472, at *5 (E.D. Pa. June 8, 1993) ("Because Tompkins Rubber's argument that Carroll cannot make a prima facie case is intertwined with its assertion that Carroll's repeated insubordination was a legitimate reason for the discharge, we will assume, for the purposes of analysis, that Carroll has made out the *prima facie* case and shift our lens to analyze the pretext issue."), *aff'd*, 16 F.3d 402 (3d Cir. 1993).

Viewed as a whole, and in the light most favorable to Ms. Cotter, the evidence presented is sufficient to establish her *prima facie* case and would allow a jury to infer that American Bridge's decision to include Ms. Cotter's position in the RIF was motivated by discriminatory animus or bias against female executives, rather than by a gender-neutral determination that her position was unnecessary. In particular, the Court finds that the following disputes of material fact exist and could be resolved by a jury in favor of Ms. Cotter:

**1. There is a dispute of fact as to whether the two decisionmakers harbored biases against women in executive positions.** It is undisputed that the decision to recommend Ms. Cotter's position for inclusion in the RIF was made by American Bridge's "Steering Committee," consisting solely of Ken Sible and Terry Poole. ECF 54-1, PDF p. 29. Ms. Cotter presented at least some evidence from which a jury could conclude that both men harbored biases against female executives. For example:

**a.** American Bridge's former CEO, Paul Boechler, testified about the company's "quite patriarchal" culture and, more importantly, Mr. Poole's "old-school" bias against female engineers and executives—which Mr. Boechler said necessitated "very forward" conversations with Mr. Poole about, among other things, the need to ignore gender when "finding the right people" for projects. *Id.* at PDF pp. 23-24.

**b.** Ms. Cotter testified that, while discussing a female candidate for a Vice-President position, Mr. Sible commented to her that the other Vice-Presidents

"will never work with a woman" and then crossed the candidate off the list.[4] *Id.* at PDF p. 10.

**c.** Ms. Cotter testified that American Bridge's Human Resources Manager, Kathy Partanza, told her "at least twice" that Mr. Sible had "a difficult time working with and for women." *Id.* at PDF p. 12. Another former employee at American Bridge, Dora Murphy, also testified that Ms. Partanza had made similar comments to her regarding Mr. Sible's alleged bias. ECF 54-2, PDF p. 21 ("Q: So it's your testimony that Kathy told you that Ken Sible discriminates against women? A: Correct, yes. Q: When did Kathy tell you this? A: … [S]everal conversations that Kathy and I have had. … Q: So tell me what she confirmed to you that Ken said to her. A: What she confirmed to me was comments that I guess Ken would make that alluded to the fact that women should be at home and not in the workplace.").

This evidence is not, as American Bridge argues, the equivalent of "stray remark" evidence that is often discounted in employment-discrimination cases. Rather, it is evidence that, if believed, a jury could reasonably rely on to infer that both decisionmakers involved in the decision to include Ms. Cotter in the RIF harbored biases against female executives. Such "background evidence … may be critical to a jury's determination of whether the decision-maker was more likely than not acting out of a discriminatory motive." *Doe*, 527 F.3d at 368; *cf. Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1214-15 (3d Cir. 1995) (evidence that decisionmaker said "things would begin to hum around here when we got rid of the old fogies" was properly admitted, because "discriminatory comments by an executive connected with

---

[4] American Bridge admits to part of this. That is, it admits that Mr. Sible commented that "it would be interesting to see how the VPs would respond reporting to a woman," but says that the job in question was offered to the female candidate (who turned it down) and that Mr. Sible supported that job offer. Of course, on summary judgment, the Court views the evidence in the light most favorable to Ms. Cotter. And in any event, a jury could infer bias (and a willingness to consider gender in employment decisions) from either version, even if the weight of the evidence might be diminished.

the decisionmaking process will often be the plaintiff's strongest circumstantial evidence of discrimination"); *id.* at 1214 ("[W]e have held that discriminatory comments by nondecisionmakers, or statements temporally remote from the decision at issue, may properly be used to build a circumstantial case of discrimination."); *Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 55 (3d Cir. 1990) ("[A] jury could find that Czerniawski's testimony that Cowen used th[e] phrase ['old dogs won't hunt'] … indicated a bias against older employees. Of course, a jury could also decide, as did the district court, that the phrase only indicated dissatisfaction with employees associated with the previous management of Alpha, but this is precisely the sort of question which must be left to the jury."); *Pacunas v. Gardner, Inc.*, No. 08-2596, 2009 WL 10687989, at *4 (D.N.J. Sept. 16, 2009) ("[T]hose instances where courts insulate defendants from liability based on stray remarks often concern isolated statements that do not directly concern hiring or firing, or are comments by non-decisionmakers[.]").

To be clear, this evidence, standing alone, may not provide the sort of specific evidence by which Ms. Cotter can either meet her *prima facie* burden or establish pretext. But as background evidence, and in combination with the other disputed evidence (discussed below), it serves to bolster Ms. Cotter's case. *Cf. Roebuck v. Drexel Univ.*, 852 F.2d 715, 733 (3d Cir. 1988) ("Although Hagerty's statements standing alone, occurring as they did over five years before the final denial of tenure, could not suffice to uphold a finding that Drexel discriminated against Roebuck, they do add support, in combination with the other evidence, to the ultimate conclusion.").

**2.** **There is a dispute of fact as to whether Ms. Cotter's position was irregularly singled out for inclusion in the RIF.** When considered together with the generalized evidence of bias discussed above, a jury could infer that Ms. Cotter's inclusion in the RIF was pretextual, based on evidence that Mr. Sible and Mr. Poole singled out her position for elimination in an irregular manner.

In 2018, American Bridge formed a "Business Improvement Task Force" to make recommendations regarding potential business improvements, including options for cost cutting. ECF 54-1, PDF pp. 29, 36-37. The Task Force was "sponsored" by the company's "Steering Committee" (*i.e.,* Mr. Sible and Mr. Poole), headed by Ken Burk (a member of the Board of Directors), and otherwise consisted of Ms. Cotter, Keith Bassano (Controller), Nick Greco (Chief Engineer East), Adam Rolebuck (Project Manager), and Neil Napolitano. *Id.* at PDF pp. 29, 36-37. The Task Force examined the company's existing structure for redundancy and profitability, and ultimately recommended eliminating several positions, including marketing, estimator, and project-manager positions. *Id.* at PDF pp. 4-5, 36. According to the testimony of Ms. Cotter and Mr. Bassano, the Task Force presented a report to Mr. Sible and Mr. Poole that included the positions it recommended eliminating and a corresponding organizational chart. *Id.* at PDF pp. 17, 41.

The Task Force's recommendations formed the basis for most of the RIF ultimately proposed by Mr. Sible and Mr. Poole. And while American Bridge points out that Mr. Sible and Mr. Poole proposed a substantial number of additional cost-cutting measures beyond those recommended by the Task Force, Ms. Cotter testified that hers was the only eliminated position that she did not recognize as having been recommended for elimination by the Task Force. *Id.* at PDF pp. 17-18. There is no evidence contradicting Ms. Cotter's testimony that she was the only person added to the RIF who was not recommended for inclusion by the Task Force, and there is no dispute that the initial decision that her position was "unnecessary" was made by Mr. Sible and Mr. Poole. Prior to her termination, Ms. Cotter was the highest-ranking female executive at American Bridge, aside from a few women on the Board of Directors. *Id.* at PDF p. 24.

These facts, combined with the evidence from which a jury could infer that Mr. Sible and Mr. Poole harbored biases against female executives, establish the sort of irregularity that permits an inference of pretext.

**3.** **There is a dispute of fact as to whether, despite claiming Ms. Cotter's position was unnecessary, American Bridge replaced her with a man soon after**. American Bridge says that Mr. Poole and Mr. Sible decided to include Ms. Cotter in the RIF because they determined that it was unnecessary to have someone dedicated to performing "quality control" functions at the corporate level. Instead, American Bridge claims that it decided to decentralize "quality" functions to individual project managers. Given this, it is significant that, just four months after Ms. Cotter was terminated, American Bridge promoted a man, Jason Hoover, to be the company's "Director of Project Services," where he was given corporate-level responsibility for, among other things, "quality."

American Bridge admits that Mr. Hoover "assumed certain duties that Plaintiff had performed," but insists that "Mr. Hoover is not performing the same type of role that Plaintiff perform[ed] in regards to quality[.]" ECF 59, p. 7. Rather, it says that "the responsibility for quality still rests with each individual project site," and that "Mr. Hoover's involvement with quality is limited to providing additional backup that the projects need." *Id.* In contrast, "Plaintiff was responsible for, among other things, managing the quality control process at the corporate level, coordinating quality assurance personnel, developing a quality management system and maintaining a corporate wide unified quality management system." *Id.* Separately, American Bridge asserts that "at the time [Mr. Poole] made his presentation to the Board [recommending the RIF], there was no intention to reassign any duties to Mr. Hoover." *Id.* at 8. Rather, Mr. Hoover was promoted to his "newly created position under a new CEO," who took over in November 2018. *Id.*

With respect to the first point, while American Bridge's explanation could be persuasive to a jury, the fact remains that just four months after Mr. Sible and Mr. Poole supposedly determined that Ms. Cotter's position was unnecessary, the company found it necessary to have a male employee handle some quality-control functions at the corporate level. That is an uncomfortable overlap for which a jury would not be *required* to accept American Bridge's explanation.

As for the fact that Mr. Hoover was promoted by a new CEO, that is certainly a relevant fact that American Bridge could present to a jury to explain any incongruity as a difference in business judgment. But a jury could also look at it another way. That is, the fact that a new, "neutral" CEO came in and almost immediately determined that some degree of corporate-level quality control (or quality "support") was necessary casts doubt on whether Mr. Sible and Mr. Poole genuinely determined that Ms. Cotter's position was unnecessary in the first place.

In short, when viewed in the light most favorable to Ms. Cotter, the evidence here would support an inference that American Bridge replaced at least some of Ms. Cotter's corporate-level functions with a male employee, shortly after telling her those functions were unnecessary. When weighed in combination with the evidence discussed above, the Court finds that Ms. Cotter has presented sufficient evidence to establish her *prima facie* case, and, further, that a jury could permissibly infer that American Bridge's proffered explanation for her firing was pretextual.[5]

---

[5] Ms. Cotter also presents some other evidence that, while perhaps not suggestive of pretext on its own, could provide relevant context that might "color" the jury's view of the evidence discussed above and thus support an inference of pretext. For example, the termination letter sent to Ms. Cotter indicated that the decision of which employees to terminate was based on "business needs, employment reviews, and employee skills and experience." ECF 54-1 PDF pp. 30-31; ECF 54-2, PDF p. 1. But Mr. Sible then testified that neither he nor Mr. Poole looked at the work performance, performance reviews, experience, or skills of any employee they proposed terminating. ECF 54-1, PDF pp. 2-3, 30. Rather, he claimed that they looked only at the position the employee held. *Id.* at PDF p. 32. Whether this amounts to a relevant

## **CONCLUSION**

For all the reasons discussed above, the Court concludes that Ms. Cotter has presented sufficient evidence to raise a genuine dispute of material fact, and thus is entitled to present her sex-discrimination claims to a jury. The Court will deny American Bridge's motion for summary judgment. An appropriate order follows.

DATE: March 11, 2021                                        BY THE COURT:

/s/ *J. Nicholas Ranjan*
United States District Judge

---

"inconsistency" or not, it is certainly suggestive of an *ad hoc* decision-making process more likely to be infected by the decisionmakers' biases.